FILED

2016 Jun-29  PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| STEVE PARTON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. 5:15-CV-02221-CLS |
| | ) | |
| BLAKE DORNING *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDERS

The amended complaint of plaintiff, former Madison County Deputy Sheriff Steve Parton, asserts one claim under 42 U.S.C. § 1983 for an alleged violation of his Fourth Amendment right to be free from an illegal seizure (*i.e.*, false arrest).[1]  He named sixteen individuals as defendants, including:  Blake Dorning, the Sheriff of Madison County, Alabama; twelve present or former officers of the Madison County Sheriff's Department; Robert Broussard, the District Attorney for the 23rd Judicial Circuit of Alabama (Madison County); and, two Assistant District Attorneys.  The action is before the court on defense motions to dismiss the sole claim alleged in plaintiff's amended complaint. The first motion (doc. no. 35) was filed by Blake Dorning, the Sheriff of Madison County, Alabama, and five of his deputies:  Charles Berry; Brian Chaffin; T.A. Miller;

---

[1] Doc. no. 30 (First Amended Complaint), ¶¶ 112-16.

Forrest Edde; and Steve Finley.[2]   The second motion (doc. no. 40) was filed by the seven remaining Madison County Deputy Sheriffs sued by plaintiff:   Steve Watson; Curtis Sanders; Chris Stephens; Kerry Phillips; Marion Bullock; Charles Zeissler; and Robert Hayes.[3]   The final motion (doc. no. 43) was filed by District Attorney Robert Broussard and Assistant District Attorneys Marc Sandlin and Robert Becher.[4]   Upon consideration, the court finds that each motion is due to be granted, and all claims dismissed.

## I.  LEGAL STANDARDS FOR MOTIONS TO DISMISS

Federal Rule of Civil Procedure 12(b) permits a party to move to dismiss a complaint for, among other reasons, "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  That rule must be read together with Rule 8(a), which requires that a pleading contain only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).   While that   pleading

---

[2] On the date of plaintiff's arrest, **Charles Berry** was Captain of the Madison County Sheriff Department's investigations division, **Brian Chaffin** was a sergeant in that same division and reported directly to Charles Berry and Kerry Phillips, **T.A. Miller** was a sergeant and an investigator, and **Forrest Edde** and **Steve Finley** were investigators.  *See* doc. no. 30 (First Amended Complaint), ¶¶ 6, 11-14.

[3] On the date of plaintiff's arrest, **Steve Watson** was captain of the Madison County Sheriff Department's patrol division, **Curtis Sanders** was captain of the records division, **Chris Stephens** was a sergeant (but had recently vacated the position of Chief Deputy Sheriff), **Kerry Phillips** was a lieutenant under Charles Berry in the investigations division, and an administrative assistant to Sheriff Dorning, **Marion Bullock** was a lieutenant, **Charles Zeissler** was a lieutenant, and **Robert Hayes** served as a sergeant.  *See id.* at 2-3, ¶¶ 3-5 and 7-10.

[4] **Robert Broussard** is the District Attorney for Madison County (the 23rd Judicial Circuit of Alabama), and held that office on the date of plaintiff's arrest.  *See id.* at 4, ¶ 15.  **Marc Sandlin** was Broussard's Chief Assistant District Attorney and **Robert Becher** was an Assistant District Attorney. *See id.* at 4, ¶¶ 16-17.

standard does not require "detailed factual allegations," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 550 (2007), it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). As the Supreme Court stated in *Iqbal*:

> A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." [*Twombly*, 550 U.S., at 555]. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557.
>
> To survive a motion to dismiss founded upon Federal Rule of Civil Procedure 12(b)(6), [for failure to state a claim upon which relief can be granted], a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Id.*, at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).
>
> Two working principles underlie our decision in *Twombly*. *First*, the tenet that a court must accept as true all of the allegations contained in a complaint is *inapplicable to legal conclusions*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.*, at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Second*, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.*, at 556.

Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not "show[n]" — "that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. *When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.*

*Iqbal*, 556 U.S. at 678-79 (emphasis supplied) (first and third alterations supplied, other alterations in original).

## II. FACTUAL ALLEGATIONS OF PLAINTIFF'S AMENDED COMPLAINT

The essence of the claim raised by plaintiff, Steve Parton, is that defendants unlawfully arrested him for Theft of Property in the Second Degree as part of a conspiracy to conceal, or divert attention from, two events: the arrest and beating of an individual named Robert Bryant; and, the subsequent murder of Jason Klonowski, who was the most outspoken supporter of Robert Bryant, and, a vocal critic of the Madison County Sheriff's Department.[5] Accordingly, it is necessary to begin by summarizing the facts pertaining to those events.

---

[5] *See* doc. no. 30 (First Amended Complaint), ¶¶ 67, 112-16.

Robert Bryant was arrested during a traffic stop in August of 2012, and brutally beaten by a group of Madison County Deputy Sheriffs "in retaliation for a barfight over a woman" that had occurred between Bryant and Madison County Deputy Sheriff Justin Watson several weeks prior to the traffic stop.[6]   Bryant's account of the events was summarized in an article published by *The Huntsville Times* reading, in part, as follows:

> Bryant . . . claimed he got in a dispute in a pool hall with Deputy Justin Watson.   He said he was later followed by deputies, pulled over without cause, asked to step out of the vehicle, and assaulted.   He said that night in August of 2012 several deputies joined in stomping him while he was handcuffed at the side of the road.   He said they knocked his teeth out, beat him unconscious, used a stun gun on him, hit him with a collapsible baton and charged him with assaulting an officer.

Challen Stephens, "Madison County Sheriff's Department settles 'revenge beatdown' lawsuit for $625,000," al.com (July 31, 2014) (ellipsis supplied).[7]   As Bryant prepared to file a civil rights complaint against Deputy Watson and other members of the Madison County Sheriff's Department involved in the August 2012 roadside assault and arrest,[8] one of his friends, Jason Klonowski, financed the legal expenses attendant to Bryant's defense of the "assaulting an officer" charge, held rallies in support of Bryant, and displayed signs on his property protesting the "brutality" of the Madison County Sheriff's

---

[6] *Id.* ¶ 21.

[7] http://www.al.com/news/index.ssf/2014/07/madison_county_sheriff_settles.html.

[8] *Id.*

Department.[9]

Jason Klonowski was murdered by a gunshot wound to the back of his head on or about October 30, 2013.[10]  His body was discovered on November 3, 2013, by Denise Nunley Brown, who was a friend of Klonowski, and also of Robert Bryant.[11]  After Ms. Brown reported the death to the 911 dispatch center, the plaintiff in this action, Madison County Deputy Sheriff Steve Parton, was the first law enforcement officer to arrive at the scene.[12]

Notably, plaintiff and Denise Brown had been involved in an intimate relationship for approximately a decade, and had lived together on the same road as Jason

---

[9] *Id.* ¶¶ 23-26.  Bryant was Klonowski's handyman and friend.  Klonowski "printed up t-shirts and yard signs to protest [the] 'brutality' of [the Madison County Sheriff's Deputies].  He "built a stage in his front yard" on which to host rallies in support of Bryant.  Challen Stephens, *One year later: No arrests, no answers in execution of Jason Klonowski*, AL.COM (Nov. 3, 2014), http://www.al.com/news/index.ssf/2014/11/one_year_later_no_arrests_no_a.html (alterations supplied).

[10] Doc. no. 30 (First Amended Complaint), ¶ 18.

[11] *Id.* ¶¶ 18, 27.

[12] *Id.* ¶ 28.  According to documents attached to the amended complaint, plaintiff "jumped the call" to the Klonowski residence at 196 Mussleman Lane "after hearing Madison County Fire dispatching a possible [unattended death call at that location]."  Doc. no. 30-1, at ECF 6 (Mad. Co. Sheriff's Dept. Miscellaneous Report Form authored by Sergeant Greg Free and dated Nov. 17, 2013) (alteration supplied).  "ECF" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing").  Bluebook Rule 7.1.4 allows citation to page numbers generated by the ECF header.  *The Bluebook: A Uniform System of Citation*, at 21 (Columbia Law Review Ass'n et al. eds., 19th ed. 2010).  Even so, the Bluebook recommends against citation to ECF pagination in lieu of original pagination.  Consequently, unless stated otherwise, this court will cite to the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters "ECF."

Klonowski's residence until the year before Klonowski was murdered.[13]   One document attached to the amended complaint described Ms. Brown as plaintiff's "ex common law wife."[14]   Plaintiff also knew Klonowski and Robert Bryant, and allegedly was a friend of both.[15]

After plaintiff arrived on the scene, Fire Department personnel notified him that there was an unsecured firearm in a leather holster "on the open tailgate or in the bed of Klonowski's pickup,"[16] which was parked "within just a few feet of where [Klonowski's body] was found, directly in the middle of the crime scene area."[17]   Plaintiff alleges that he "picked up the gun to secure it for safety reasons,"[18] unloaded it, and placed the

---

[13] *See id.* at ECF 8 (Audit Findings by Sergeant T.A. Miller, dated Nov. 15, 2013) ("Ms. Brown and Dep. Parton are in a personal relationship and have been for the last 10 years.  Dep. Parton lived with her until recently, at her residence across the street from the Crime Scene.").  Note also the handwritten notation at the bottom of this same page, apparently printed by plaintiff (*compare* printed notation on bottom of *id.  with* doc. no. 30-1, at ECF 11 and 12 (Nov. 6 & 8, 2013 Handwritten Statements of Plaintiff)), which states:  "I moved out of Ms. Brown [*sic*] residence late September early October of 2012 and have had very little communication with her since that time."

[14] *See id.* at ECF 6 (Mad. Co. Sheriff's Dept. Miscellaneous Report Form authored by Sergeant Greg Free and dated Nov. 17, 2013), stating that:

> Writer asked Dep. Parton if he knew the deceased subject, since writer knew that there were only 4 houses on that road and that Dep. S. Parton had lived on that road for numerous years.  Dep. S. Parton advised writer that Yes he did and that Denise [Brown] (whom writer knows as being Dep. S. Parton's ex common law wife) had found the victim. . . .  [Alteration supplied.]

[15] Doc. no. 30 (First Amended Complaint), ¶ 44.

[16] *Id.* ¶ 32.

[17] Doc. no. 30-1, at ECF 9 (Audit Findings by Sergeant T.A. Miller, dated Nov. 15, 2013) (alteration supplied).

[18] Doc. no. 30 (First Amended Complaint, ¶ 33.

weapon *inside Denise Brown's automobile*, on the front passenger seat.[19]   Plaintiff alleges that he performed those acts in plain sight, and that he was not secretive when doing so,[20] but he fails to explain why, if his object was to secure the weapon for "safety reasons," he did not place it in his own patrol vehicle, rather than placing it inside his ex-girlfriend's automobile — a vehicle, it must be noted, that belonged to the person who claimed to have discovered Jason Klonowski's body.

Plaintiff attempts to explain the foregoing actions by alleging that he *then had* "no knowledge or reason to believe that Klonowski had been shot,"[21] because his body was discovered sitting in an upright position on a chair inside his barn, wearing a baseball cap, and forensic examiners did not discover bullet wounds in the back of Klonowski's head until an autopsy was performed.[22]

Plaintiff subsequently called-in the serial number engraved on the firearm to dispatch, and learned that it was registered to Donnia Monroe, who was Klonowski's stepmother and business partner.[23]   The record does not explain how Ms. Monroe learned

---

[19] *Id.* ¶ 36.

[20] *Id.* ¶ 43.

[21] *Id.* ¶ 45.

[22] *See* Challen Stephens, "One year later: No arrests, no answers in execution of Jason K l o n o w s k i ," a l . c o m ( N o v . 3 , 2 0 1 4 ), http://www.al.com/news/index.ssf/2014/11/one_year_later_no_arrests_no_a.html?hootPostID=cc6 cb4f9ea52440b444d90b1d799c076.

[23] Doc. no. 30-1, at ECF 8 (Audit Findings by Sergeant T.A. Miller, dated Nov. 15, 2013) (stating that Donnia Monroe was the victim's "business partner"); doc. no 30 (First Amended Complaint), ¶ 37 ("Parton also called the serial number of the gun in and learned the gun was owned by Donnia Monroe."); *id.* ¶ 60 (stating that plaintiff had "called the serial number of the gun in to

of Klonowski's death, but she arrived at the scene at some undisclosed time after plaintiff had placed the firearm inside Denise Brown's automobile. "Shortly after Monroe arrived at the scene, Parton removed the gun from [Ms. Brown's] vehicle and took it to Monroe."[24]    Plaintiff alleges that he then, *acting* "[*p*]*ursuant to Monroe's instructions*, . . . placed the gun in her car under the front seat."[25]

The single most important fact bearing upon the motions to dismiss — and, one that is not disputed by plaintiff — is that *he never informed investigating officers of the firearm found on the open tailgate or in the bed of Jason Klonowski's truck, nor did he log it into evidence.*[26]

---

dispatch to identify the owner"). A local news article also identified Ms. Monroe as the deceased's "stepmother." *See* Brian Lawson, *Different turns in two cases of Madison County deputies charged with stealing guns*, AL.COM (Apr. 18, 2014), http://blog.al.com/breaking/2014/04/different_turns_in_two_cases_o.html.

[24] Doc. no. 30 (First Amended Complaint), ¶ 39 (alteration supplied).

[25] *Id.* ¶ 40 (alteration, emphasis, and ellipsis supplied). *But see* doc. no. 30-1, at ECF 13 (Donnia Monroe's Letter to ADA Jeff McCluskey) ("[S]omeone had put the pistol under my front seat and I was unaware who that was but . . . I had the pistol. It was in my vehicle I was just unaware of that fact.") (alteration and ellipsis supplied).

[26] *See, e.g.*, doc. no. 30-1, at ECF 4 (Sergeant G. Free's Nov. 26, 2013 Summary) ("Deputy Steve Parton removed a firearm from a crime scene without notifying his supervisory, crime scene, or investigations [*sic*] upon their arrival to the scene nor for several day's [*sic*] after"); *id.* at ECF 6 (Mad. Co. Sheriff's Dept. Miscellaneous Report Form authored by Sergeant Greg Free and dated Nov. 17, 2013) ("Dep. S. Parton never once mentioned anything to writer about any type of firearm being found at the scene or giving anything at all to Denise"); *id.* at ECF 10 (Audit Findings by Sergeant T.A. Miller, dated Nov. 15, 2013) ("We know from all statements by all of the witnesses, that Dep. Steve Parton did, in fact, remove the handgun from the Crime Scene. We also know that he gave the gun to an unauthorized subject and it was removed completely from the Crime Scene and the entire property by the same subject. Further, we know that Dep. Steve parton did not advise anyone in an official capacity, Crime Scene Investigator, Criminal Investigator, Supervisor or any other member of the Sheriff's Dept. that he had removed the handgun from the scene of this criminal event."). *But see* doc. no. 46 (Plaintiff's Response to Defendants' Motions to Dismiss First Amended Complaint), at 3 ("While

During the week after Jason Klonowski's body was discovered, plaintiff provided two handwritten statements to the Madison County Sheriff's Department describing his actions at the Klonowski death scene.[27]   The first statement, dated November 6, 2013, reads as follows:

> Upon arrival writer was advised by County fire personnel on scene that there was a handgun in the bed of the truck.  Writer took safe keeping [*sic*] and unloaded it.   Writer secured the scene until crime scene [investigators] arrived to process the scene.  Writer noticed that the weapon appeared to be a silver Smith & Wesson 357 Magnum.  *Writer allowed Donna Monroe to take control of the firearm and watched her place the unload [sic] weapon into her vehicle.*

Parton may not have told his supervisor about the gun, he called it [*i.e.*, the serial numbers] in to dispatch.") (alteration supplied).  Even so, it is important to note that plaintiff does not allege in his First Amended Complaint, and did not state in either of his two written statements, that he told any law enforcement official about the firearm, or logged it into evidence.  *See generally* doc. no. 30 (First Amended Complaint), doc. no. 30-1, at ECF 11 (Plaintiff's Nov. 6, 2013 Statement), doc. no. 30-1, at ECF 12 (Plaintiff's Nov. 8, 2013 Statement).

[27] Although no party has raised this argument, Federal Rule of Civil Procedure 12(d) states that when "matters outside the pleadings are presented to and not excluded by the [district] court [in a Fed. R. Civ. P. 12(b)(6) motion], the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d) (alterations supplied).  In other words, "[a] court is generally limited to reviewing what is within the four corners of the complaint on a motion to dismiss."  *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006) (alteration supplied).  Even so, the Eleventh Circuit has stated that "the court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed."  *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).  "Undisputed" simply means that "the authenticity of the document is not challenged."  *Id.*  Here, the only documents considered by the court are those that were attached by plaintiff to the complaint and first amended complaint.  Plaintiff does not dispute the authenticity of those documents, and heavily relies upon them in his pleadings and in his response in opposition to defendants' motions to dismiss.  *See* doc. no. 30 (First Amended Complaint); doc. no. 46 (Plaintiff's Response in Opposition to Defendants' Motions to Dismiss First Amended Complaint).  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (permitting consideration of documents incorporated into the complaint by reference on a 12(b)(6) motion).

Writer found the weapon on the driver side, just inside the bed of the truck laying on top of some bags of bread.

Doc. no. 30-1 (Nov. 6, 2013 "Statement of Witness"), at ECF 11 (alteration and emphasis supplied).

Based upon the information contained in that statement, Madison County Sheriff's Department Investigators Forrest Edde and Steve Finley drove to Donnia Monroe's place of business the following day, November 7, 2013, where they spoke with Ms. Monroe and asked to search her vehicle. The gun was found under the front seat where — as Ms. Monroe later wrote in a letter to Madison County Assistant District Attorney Jeffrey McCluskey — "*someone* had placed it."[28]

Plaintiff was asked to provide a second, and more detailed, statement on November 8, 2013. That document reads as follows:

I was dispatched to 196 Mussleman Lane for a possible unattended death, when I arrived County fire personnel was already there. I got out of my car and noticed that Denise Brown was standing within approximately three feet of County fire personnel and the victim. I ran from my car to get to Mrs. Brown to remove her from the area so County fire would not be distracted by Mrs. Brown's screams and her cry's [*sic*]. I advised Mrs. Brown to walk up toward her vehicle and she did not respond to my directions. At that time I stepped in between Mrs. Brown and the victim[,

---

[28] Doc. no. 30-1, at ECF 13 (April 7, 2014 Letter from Donnia S. Monroe to Assistant District Attorney Jeffrey McCluskey), at 4th ¶ ("On November 7, 2013 Investigator Eddy and Finley came to our office and we found the pistol under the seat of my vehicle *where someone placed it.*") (emphasis supplied); *see also id.* at 5th ¶ ("On November 15, 2013 Sergeant Miller with Madison County CID called to ask what had happened concerning the gun in the leather holster. I explained to him that *someone had put the pistol under my front seat and I was unaware who that was* but that I had the pistol. It was in my vehicle *I was just unaware of that fact.*") (emphasis supplied).

and] placed my hand on her back to escort her away from the area.  At that time County fire personnel advised me that there was a handgun sitting in the bed of the truck within a couple of feet of where the scene was.  *I took the handgun, that was in a brown holster and took it and Mrs. Brown away from the scene.  I unload* [sic] *the handgun and placed it into Mrs. Brown[']s vehicle*, a silver Kia Sportage, because I had several people arriving at the scene.  I was the only Deputy present and I was trying to maintain the scene and keep people away that does [sic] not need to be there.  To the best of my knowledge the handgun is a Smith & Wesson, silver 357 Magnum revolver.  I did notice that the handgun was fully loaded with no rounds fired.  *I was advised by Donna Monroe that the firearm was in her name so I gave her the weapon and I placed it in her vehicle.*

Doc. no. 30-1, at ECF 12 (Nov. 8, 2013 "Voluntary Statement") (alterations and emphasis supplied).

After reviewing the inconsistencies between plaintiff's two statements, the Madison County Sheriff's Department commenced an investigation into his conduct. Plaintiff was placed on administrative leave on November 14, 2013.[29]  The following day, Sergeant T.A. Miller published an "audit report," which provides relevant background information and details of the Department's investigation:

On November 12, 2013, Writer was given the task of an Audit, pertaining to the handling and actions of Dep. Steve Parton, Employee #7252, at the Crime Scene of Case # 55/026649.  It is a Death Investigation, turned Homicide Investigation.  *There is an alleged mis-handling of evidence/property at this location by this listed Deputy.*  Lt. Phillips advised writer of this assignment and that it was a directive from Capt. Berry.

On November 13, 2013, writer obtained statements written by Dep. Parton in reference to the disposition of a handgun found at the Crime

---

[29] *See* doc. no. 30-1, at ECF 7 (Offense Report Written by Officer Brian Hughes).

Scene by Dep. Parton.  Also, his actions, if any, in reference to the handgun.
There were two separate statements written by Dep. Parton, at the request
of Inv. Edde.  On November 6th, after Inv. Edde received information about
there possibly being another gun at the scene.  Then on November 8th, Inv.
Edde asked Dep. Parton to write a more detailed statement than the first
one he had written.  He asked him to be more specific in detail about his
actions concerning the gun.  *The two statements are contradictory to each
other.  In the first statement Dep. Parton stated he watched Donnia
Monroe, victim's business partner, place the weapon into her vehicle,
after he had given it to her.  In the second statement, Dep. Parton stated
he placed the weapon in Donnia Monroe's vehicle, after she advised him
that the gun was in her name.  In neither statement did Dep. Parton
mention anything about the weapon being in the possession of, or in the
vehicle of, the Complainant and person who discovered the body of the
victim, Denise Nunley Brown.*  Denise Brown lives across the street from
the victim and also, cleaned his house for him on a weekly basis.  Denise
Nunley Brown was also known by Dep. Parton prior to this date.[30]  Ms.
Brown and Dep. Parton are in a personal relationship and have been for the
last 10 years.  Dep. Parton lived with her until recently, at her residence
across the street from the Crime Scene.  *Dep. Parton did not mention
their relationship, or any participation by her, in the events
surrounding the gun, in either statement.*

        . . . .

        The remaining information in this report is from statement [*sic*]
made by the participants.

        Denise Nunley Brown stated that when Dep. Parton removed the
handgun, in a brown leather type holster, from the bed of victim's pickup
truck, he walked over to her and told her to put the gun in [the] vehicle's
front seat.  Denise stated she questioned why and Dep. Parton stated he had
to put it somewhere, and walked with her to her vehicle and she put it on her
front seat.  During this time, according to Ms. Brown, Donnia Monroe, the

---

30 A footnote to this sentence is handwritten at the bottom of this page of the Audit Findings
and, as previously described in note 13, *supra*, states (in printed letters similar to others made by
plaintiff): "I moved out of Ms. Brown [*sic*] residence late September early October of 2012 and have
had very little communication with her since that time."

victim's business partner, and her close friend, Pam Sweeton, arrived at the scene and saw the victim, sitting in the chair as found, deceased. The victim's pickup truck was parked within just a few feet of where the victim was found, directly in the middle of the crime scene area. Denise stated she told Dep. Parton to give the handgun to Donnia because she had heard her say that she had purchased the gun and it was in her name.

Donnia's friend, Pam Sweeton[,] interrupted and told Dep. Parton to give her the gun and she would give the gun to Donnia Monroe. At this point, according to Denise, Dep. Parton took the gun from the front seat of Denise Brown's vehicle and carried the gun over to Donnia Monroe's car and placed it inside her vehicle. According to statements made to writer by both Donnia Monroe and Pam Sweeton, neither of them knew that the handgun had been placed inside of Donnia's car. They both stated that Dep. Parton did not tell them he had placed it there. They both did state that they were very upset at the time, due to the passing of their friend and business associate, and may have been told things that day, at the scene, that they may not have heard or didn't register with them, but, they both felt they would have remembered any statement that would have been made to them concerning the handgun. *Both Donnia and Pam told writer they did not know the gun was in Donnia's car until Inv. Edde and Inv. Finley came to her business and they went out together to check her car and the handgun was located under the front passenger seat.* Inv. Edde and Inv. Finley went to check for the gun in Donnia's vehicle after they were told by Denise Nunley Brown that that was the location of the gun the last time she knew of it's [*sic*] whereabouts.

In summary, we know that the handgun in question, a Smith & Wesson .357 Magnum Revolver[,] was in fact on the scene of the Homicide on the date and time of discovery, November 3, 2013 @ 11:58 hrs. We know from all statements by all of the witnesses, that *Dep. Steve Parton did, in fact, remove the handgun from the Crime Scene. We also know he gave the gun to an unauthorized subject and it was removed completely from the Crime Scene and the entire property by the same subject. Further, we know that Dep. Steve Parton did not advise anyone in an official capacity, Crime Scene Investigator, Criminal Investigator, Supervisor, or any other member of the Sheriff's Dept., that he had removed the handgun from the scene of this criminal event. We know*

14

> *finally, that he contradicts himself in two separate statements of his own*
> *words, about the actions he himself took that day at the scene of this*
> *Homicide. . . .*

Doc. no. 30-1, at ECF 8-10 (Audit Findings of Sergeant T.A. Miller dated Nov. 15, 2013)

(emphasis, alterations, and ellipses supplied).

Plaintiff was issued a written "Employee Warning" by Captain Steve Watson on

November 26, 2013, for having "removed a firearm from a crime scene without notifying

his supervisor, crime scene[,] or investigat[ors] upon their arrival to the scene[,] nor for

several day's [sic] after."[31]   The "Employee Warning" indicated that the "Nature of

Violation" was "Substandard Work," "Carelessness," and "Disobedience."[32]

On December 3, 2013, plaintiff received a letter from Madison County Sheriff

Blake Dorning, stating that disciplinary action was being considered as a consequence

for plaintiff's "mishandl[ing] evidence by removing a firearm from a crime scene and

then fail[ing] to report this in [his] written reports or to [his] supervisors or anyone

investigating this incident."[33]

Plaintiff's employment with the Madison County Sheriff's Department was

terminated in December of 2013.[34]

Plaintiff was arrested for theft of property in the second degree on February 5,

---

[31] Doc. no. 30-1, at ECF 4 (alterations supplied).

[32] *Id.* at ECF 3.

[33] *Id.* at ECF 1 (Dec. 3, 2013 Letter) (alterations supplied).

[34] Doc. no. 30 (First Amended Complaint), ¶ 51.

2014, for his actions involving the firearm at the Klonowski death scene.[35]

Plaintiff asserts that his arrest was unlawfully orchestrated as part of a conspiracy to "cover for Justin Watson,"[36] who orchestrated the brutal beating of Robert Bryant.   In support of his theory, plaintiff contrasts the repercussions he faced for failing to report or log into evidence the firearm discovered at the Klonowski murder scene[37] — *i.e.*, termination of employment, and being charged with the offense of theft of property in the second degree — with the two-week suspension without pay imposed upon Deputy Justin Watson for his role in stalking and physically attacking Robert Bryant, and subsequently lying about those events during a state court preliminary hearing.[38]

Plaintiff also cites notes from an internal investigation file related to the Robert Bryant matter in support of his allegation that defendants conspired to falsely charge and prosecute him for an improper purpose.[39]   The full text of those notes, drafted by Captain

---

[35] *Id.* ¶¶ 51, 89.  *See* Ala. Code §§ 13A-8-2, 13A-8-4(c) (1975).

[36] Doc. no. 30 (First Amended Complaint), ¶ 79 (alteration supplied).

[37] He describes his failure to do so as "minor," "unintentional," and "innocent."  *See id.* ¶¶ 48-49.

[38] *Id.* ¶ 52.  Deputy Watson testified at a preliminary hearing pertaining to the Robert Bryant case that he did not know it was *Bryant* when he stopped Bryant's vehicle several weeks after their physical alteration at the bar.  *See* doc. no. 1-4, at ECF 8 ("During the court proceedings, when Deputy Watson was asked by the Defense Attorney if he knew his client [*i.e.*, Robert Bryant], if he ever had any altercations with his client and other questions about any type of contact or knowledge of who his client was, Deputy Watson said "**no, sir**.") (alteration supplied, boldface emphasis in original).  Even so, Madison County Sheriff's Office dispatcher Amanda Billings testified that Deputy Watson had pressured her to find out Bryant's name and information after the bar fight, which she eventually did, and provided to Deputy Watson, after he threatened to return to the bar with a SWAT team and confront Bryant.  *See* doc. no. 1-4, at ECF 3.

[39] *See* doc. no. 30 (First Amended Complaint), ¶¶ 71-74, and doc. no. 30-2.

Charles Berry,[40] read as follows:

> 01-28-14 1400 HRS
>
> Spoke with Sheriff Dorning at his office in reference to Deputy Steve Parton taking the firearm from the Klonowski murder scene and bringing charges on Parton.   Sheriff stated he did not have a problem with it and to check with the District Attorneys office.
>
> 01-30-14 1310 HRS
>
> I had instructed Sgt. Miller and Inv. Edde to meet with the District Attorneys office in reference to charging Steve Parton with taking the firearm from [the Klonowski] murder scene.   On 01-30-14 Inv. Edde received a phone call from Rebekah Callahan Deputy District Attorney who advised Edde that the D.A.'s office would not get involved due to the A.B.I. [*i.e.*, Alabama Bureau of Investigation] working the case.   Edde & Miller were to meet with Callahan on 01-30-14 at 1330 hrs.   Myself and Chaffin traveled to the D.A.'s office and met with Callahan and Randy Dill. Callahan stated that her boss Marc Sandlin had advised her that [they were] not getting involved in this due to A.B.I. working the case.   I explained that A.B.I. was not handling this part of the case.   Callahan state[d] that she was going to do what her boss (Sandlin) told her to do and not get involved.
>
> 01-30-14 1242 HRS
>
> I contacted Sgt. Bradley Renfroe A.B.I. and ask[ed] if A.B.I. was going to pursue any charges against Steve Parton for taking the firearm from the Klonowski murder scene.   Renfroe stated that he understood the request to A.B.I. was to investigate the murder and that was what they were doing.
>
> 01-30-14 1310 HRS
>
> I explained to Callahan that we only wanted direction in the case and we would ask the Attorney General to assist us.

---

[40] *See* doc. no. 30 (First Amended Complaint), ¶¶ 80-88.

01-31-14 0945 HRS

I called the D.A.'s office and left a message for Marc Sandlin to call me.

01-31-14 1105 HRS

Myself and Chaffin met with Marc Sandlin and Bob Becker [*sic*] at the D.A.'s office and discussed the Steve Parton case.  We were advised to charge Parton with theft 2$^{\underline{nd}}$.

Doc. no. 30-2, at ECF 1-4 (alterations supplied).

Plaintiff asserts that the foregoing notes "make clear that the Parton prosecution was for an improper purpose, presumably related to covering up the Robert Bryant matter, and not for legitimate law enforcement reasons."[41]   Plaintiff also poses the following question:

Why would numerous deputies and supervisory personnel up to and including the sheriff manufacture criminal charges against a fellow law enforcement officer?   Ordinarily, of course, law enforcement officers err on the side of protecting their own, often to a fault, meaning one or more strong contrary motivations must have been at work.

Doc. no. 30 (First Amended Complaint), ¶ 64.   Plaintiff then answers his own question as follows:   "While the precise motive may not yet be known, it seems clear that Parton's relationships with [Denise] Brown, [Robert] Bryant, and [Jason] Klonowski are the likely source."[42]   He further alleges that "[t]iming suggests" the decision to charge

---

[41] *Id.* ¶ 73.

[42] *Id.* ¶ 65 (alterations supplied).

him criminally was "related to the cover-up of the Robert Bryant beating,"[43] in that "the possibility of charging [plaintiff] did not come up until two months [after plaintiff was terminated from the Madison County Sheriff's Department], after negative publicity regarding Justin Watson and the investigation of Klonowski's murder by the sheriff forced everyone's hand."[44]   Plaintiff provides no explanation as to how his arrest might have aided a "cover-up" of the Robert Bryant police beating or Jason Klonowski murder.

Madison County District Judge Linda Coats dismissed the second-degree theft charge against plaintiff on April 16, 2014.[45]   Plaintiff filed this civil rights action on December 4, 2015.

## III. DISCUSSION

### A.   Motion of Defendants Dorning, Berry, Chaffin, Miller, Edde, and Finley

Defendants Blake Dorning, Charles Berry, Brian Chaffin, T.A. Miller, Forrest Edde, and Steve Finely assert that they are "entitled to qualified immunity from Parton's § 1983 claims."[46]   When a state, county, or municipal official is sued personally, or in an "individual capacity," for money damages under § 1983, he is entitled to invoke the

---

[43] *Id.* ¶ 67 (alteration supplied).

[44] Doc. no. 46 (Plaintiff's Response to Defendants' Motions to Dismiss First Amended Complaint), at 4 (alterations supplied).

[45] Doc. no. 30 (First Amended Complaint), ¶ 93.

[46] Doc. no. 36 (Brief in Support of Motion to Dismiss), at 12. Defendants also argue that, if the district attorney defendants (*i.e.*, Becher, Broussard, and Sandlin) are dismissed, then they also are due to be dismissed pursuant to the so-called "intracorporate conspiracy doctrine." *Id.* at 23. Because this court finds that defendants are entitled to qualified immunity, it will not address defendants' "intracorporate conspiracy doctrine" argument.

doctrine of "qualified immunity" as a defense to the claim.   *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991).   The defense provides complete protection for governmental officials whose conduct violates "no clearly established statutory or constitutional rights of which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also, e.g.*, *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001) (same).   Courts generally apply a two-part test for evaluating whether a defendant is entitled to qualified immunity.   The "threshold question" for the district court to ask is whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right?"   *Saucier v. Katz,* 533 U.S. 194, 201 (2001).[47]   If the threshold question is answered positively, the court will proceed to analyze the second aspect of the two-part inquiry:   *i.e.*, "whether the right was clearly established."   *Id.*[48]

---

[47] The defendant claiming immunity must also "prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'"   *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). Here, it cannot reasonably be disputed that both Long and Houk were acting within the scope of their discretionary authority as police officers during the events that serve as the basis of this suit.   Hence, that undisputed fact does not merit textual discussion.

[48] The Supreme Court recently relieved lower courts from mandatory adherence to the order of the two-part analysis articulated in *Saucier*.   *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").   It is now within this court's discretion to, in appropriate cases, assume that a constitutional violation occurred for the purpose of addressing, in the first instance, whether such a violation would be "clearly established."   *Id.*   That said, and under the circumstances of the present case, the tested sequence of analysis of *Saucier* will be followed.

The purpose of this immunity is to allow public officials to perform discretionary functions without the fear of personal liability or harassing litigation, *see Anderson v. Creighton*, 483 U.S. 635, 638 (1987), thereby protecting from suit "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

> In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. If the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity.

*Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citations and internal quotation marks omitted).[49]

Defendants clearly were acting within their discretionary authority when they arrested plaintiff. *See, e.g.*, *Crenshaw v. Lister*, 556 F.3d 1283, 1289-90 (11th Cir. 2009); *Lee v. Ferraro*, 284 F.3d at 1194. Accordingly, the burden shifts to the plaintiff

---

[49] The Fourth Circuit explained the policy rationale for protecting governmental officials from civil liability for discretionary decisions in the following manner:

> Discretionary decisions by government actors inevitably impact the lives of private individuals, sometimes with harmful effects. Moreover, such decisions are inescapably imperfect. Especially in the context of police work, decisions must be made in an atmosphere of great uncertainty. Holding police officers liable in hindsight for every injurious consequence of their actions would paralyze the functions of law enforcement. *Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir. 1991). Qualified immunity thus allows officials the freedom to exercise fair judgment, protecting "all but the plainly incompetent or those who knowingly violate the law."

*Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir. 1995) (*en banc*) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

to demonstrate that qualified immunity is not appropriate by showing the deprivation of a federal constitutional or statutory right that was clearly established at the time of the official's action.   *See, e.g.*, *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991).

"An arrest does not violate the Fourth Amendment if a police officer has probable cause for the arrest."   *Wood v. Kessler*, 323 F.3d 872, 878 (11th Cir. 2003).   Probable cause to effect an arrest exists if, at the moment the arrest was made, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that the person arrested either had committed, or was committing, an offense.   *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) (alteration supplied); *see also, e.g.*, *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (same); *Grayson v. Thompson*, 257 F.3d 1194, 1217 (11th Cir. 2001) (same).   "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."   *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *see also, e.g.*, *Lee*, 284 F.3d at 1196 (same) (citing *Atwater*).

Moreover, an arrest will not violate the Fourth Amendment even when a police officer lacks *actual* probable cause, if it can be established that he possessed "arguable

probable cause."

> Significantly, all that is required for qualified immunity to be applicable to an arresting officer is "*arguable* probable cause to believe that a person is committing a particular public offense," *Redd v. City of Enterprise*, 140 F.3d 1378, 1384 (11th Cir.1998); "that is, where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest' the plaintiffs," *id.* at 1382 (citation omitted). *See Jones*, 174 F.3d at 1283 n.3 ("Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry.").

*Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001) (emphasis in original).

"Arguable probable cause exists 'where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed to arrest.'" *Lee*, 283 F.3d at 1195 (quoting *Scarbrough*, 245 F.3d at 1302) (alteration in *Lee*).

In addition to what is said above, the Eleventh Circuit has stated in numerous opinions that it is not necessary for an officer to have possessed either actual or arguable probable cause to arrest a plaintiff for *the precise charge announced at the time of arrest*, as long as there was arguable probable cause to arrest him for *some offense. See, e.g., Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010) ("If the arresting officer had *arguable probable cause* to arrest for *any offense*, qualified immunity will apply.") (emphasis supplied); *Brown v. City of Huntsville*, 608 F.3d 724, 735 (11th Cir. 2010) (If "the arresting officer had *arguable probable cause* to arrest for *any offense*,

qualified immunity will apply.") (emphasis supplied) (citing *Skop v. City of Atlanta*, 485 F.3d 1130, 1138 (11th Cir. 2007)); *Durruthy v. Pastor*, 351 F.3d 1080, 1089 n.6 (11th Cir. 2003) ("While Durruthy was charged with violating only Fla. Stat. § 843.02, Pastor is shielded by qualified immunity so long as she had probable cause to arrest Durruthy for *any* offense.") (emphasis in original); *Merenda v. Tabor*, 506 F. App'x 862, 965 (11th Cir. 2013) ("Although Tabor originally charged Merenda with only obstruction of an officer, the 'validity of an arrest does not turn on the offense announced by the officer at the time of the arrest.' So long as an officer has '*arguable probable cause* to arrest for *any offense*, qualified immunity will apply.'") (emphasis supplied) (quoting *Bailey v. Board of County Commissioners of Alachua County*, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992), and *Grider*, 618 F.3d at 1257).

Defendants contend that there was at least arguable probable cause to arrest plaintiff, not only for the offense of theft of property in the second degree,[50] but also for the offenses of obstructing governmental operations and tampering with physical evidence.[51]   Plaintiff responds: "In no sane world could defendants have reasonably believed they had probable cause to charge [him] with a crime under the facts alleged in

---

[50] Doc. no. 36 (Brief in Support of Motion to Dismiss), at 14.

[51] *Id.* at 19.  Defendants also raise a third argument: *i.e.*, if the district attorney defendants are dismissed, then plaintiff's claims against the remaining defendants are due to be dismissed pursuant to the so-called "intracorporate conspiracy doctrine."  *Id.* at 23.  The court need not address that arguments, as it finds that defendants are entitled to the benefits of the qualified immunity doctrine.

the complaint."[52]

### 1.      Theft of Property in the Second Degree

An Alabama statute states that a "person commits the crime of theft of property if he . . . knowingly obtains or asserts unauthorized control of the property of another, with the intent to deprive the owner of his or her property."  Ala. Code § 13A-8-2 (1975) (ellipsis supplied).   Further,  theft of a firearm constitutes theft of property in the second degree.   *See* Ala. Code § 13A-8-4(d).[53]   Defendants argue on the basis of those statutes that

> a reasonable officer could have concluded that there was probable cause to believe that Parton had embarked upon a scheme of stealing what he believed to be a dead man's pistol from the Klonowski crime scene. Parton removed the pistol from the truck bed (which was located only a few feet from Klonowski's body), a location he admits he knew would shortly be under active crime scene investigation, and placed the handgun in his ex-girlfriend [Denise] Brown's vehicle.   Parton had had a 10-year relationship with the girlfriend, who lived across the street from Klonowski, and had only recently . . . stopped living with her.  He did not tell any of the officers at the scene who were investigating Klonowski's death that a firearm had been found near the decedent's body, that he had removed the firearm from the scene or that the firearm had been placed in the possession of his ex-girlfriend.   Although two other weapons removed from the crime scene were logged into evidence, the firearm removed by Parton was not, nor were any of the investigating officers made aware that Parton had taken it.

_____

[52] Doc. no. 46 (Plaintiff's Response to Defendants' Motions to Dismiss First Amended Complaint), at 3 (alteration supplied).

[53] The text of Ala. Code § 13A-8-4(d), as it existed prior to January 30, 2016, provided that: "The theft of a firearm, rifle, or shotgun, regardless of its value, constitutes theft of property in the second degree."  That language was relocated, unchanged, to Ala. Code § 13A-8-4(**c**) on January 30, 2016.

A reasonable officer could have concluded that at the time he placed the handgun in Brown's vehicle, Parton believed that the handgun belonged to the deceased.  A reasonable officer could have believed that Parton only learned later when he allegedly "called in" the pistol to dispatch that the handgun belonged to a person who was very much alive — Donnia Monroe. A reasonable officer could have believed that upon learning this, Parton feared that Monroe might start asking questions about her handgun and quickly decided to change course.   A reasonable officer could have believed that Parton's dilemma was compounded by Monroe's appearance on the scene shortly thereafter.   A reasonable officer could have believed that Parton then took the firearm from the front seat of his [ex]-girlfriend's vehicle and, without telling crime scene investigators, went over to Monroe's vehicle and placed the firearm under the seat to hide from those investigators the fact that he had taken the pistol.  A reasonable officer could have believed that Parton deliberately did not log the weapon into evidence as a part of both his initial scheme to steal the pistol and later to conceal from investigators that he had taken the weapon.

Doc. no. 36 (Brief in Support of Motion to Dismiss), at 16-18 (alterations and ellipsis supplied).   Defendants also point out that Donnia Monroe stated in a letter to Assistant District Attorney Jeffrey McCluskey that she was not aware that the handgun was in her possession until Investigators Forrest Edde and Steve Finley came to her place of business and found it while conducting a search of her vehicle.[54]

Plaintiff argues that there was neither actual nor arguable probable cause to arrest him for theft (or any other charge), because he "took possession of a loaded handgun at the request of fire department personnel, called the gun in and identified the owner, and promptly returned it to the owner."[55]   He states that he simply was "performing a

---

[54] *See supra* note 28.

[55] Doc. no. 46 (Plaintiff's Response to Defendants' Motions to Dismiss First Amended Complaint), at ECF 3.

governmental operation."[56]

Based upon the undisputed facts that plaintiff initially placed the handgun in the vehicle of an unauthorized subject with whom he had maintained an intimate relationship for many years, did not log the handgun into evidence, did not inform any law enforcement official or crime scene investigator about the weapon, subsequently (after learning that the gun was registered in the name of Donnia Monroe) placed the weapon under the front seat of Ms. Monroe's automobile, and provided two handwritten statements containing inconsistencies about the question of whether Ms. Monroe *knew* the gun had been placed in her automobile, this court concludes that a reasonable police officer could have believed that plaintiff had initially "knowingly obtain[ed] or assert[ed] unauthorized control" over the handgun, "with the intent to deprive the [assumed, deceased] owner[, Jason Klonowski,] of his or her property," Ala. Code § 13A-8-2 (1975) (alterations supplied), but subsequently abandoned the crime upon learning the gun *did not* belong to Klonowski. Accordingly, defendants are entitled to the benefits of the qualified immunity doctrine.

Even if this court should be incorrect in that conclusion, however, defendants also contend that there was arguable probable cause to arrest plaintiff for the offenses of obstructing governmental operations and tampering with physical evidence. Each is addressed below.

---

[56] *Id.* at ECF 4.

27

2.      **Obstructing governmental operations**

This offense is defined by an Alabama statute providing that:

> A person commits the crime of obstructing governmental operations if, by means of intimidation, physical force or interference or by any other independently unlawful act, he:   (1) intentionally obstructs, impairs or hinders the administration of law or other governmental function; or (2) intentionally prevents a public servant from performing a governmental function.

Ala. Code § 13A-10-2 (1975).  As defendants state:  "Parton's secretive removal of the firearm from the crime scene, without disclosing the fact that a gun had been found at the scene, or that he had taken it or where it had been put," and "not logging the weapon into evidence," was "clearly a hindrance and interference with the ability of the investigating officers to properly process and evaluate the crime scene and conduct their investigation" into the death of Jason Klonowski.[57]

This court agrees.  Defendants possessed at least arguable probable cause to arrest plaintiff for the offense of obstructing governmental operations.

3.      **Tampering with physical evidence**

This offense is defined by an Alabama statute stating that:

> A person commits the crime of tampering with physical evidence if, believing that an official proceeding is pending or may be instituted, and acting without legal right or authority he, (1) destroys, mutilates, conceals, removes or alters physical evidence with intent to impair its use, verity or availability in the pending or prospective official proceeding. . . ."

---

[57] *Id.* at 22.

28

Ala. Code § 13A-10-129 (1975) (ellipsis supplied).

Defendants observe that the "firearm was located in a truck bed just a few feet away from the body" of Jason Klonowski, and that it accordingly was "important evidence for the officers investigating the death of Klonowski to evaluate and consider in the course of their investigation."[58]   In spite of that obvious fact, plaintiff failed to apprise any of the investigating officers that a firearm had been discovered, and intentionally transferred the firearm into the vehicles of two unauthorized subjects.   A reasonable police officer could have believed that plaintiff, who undoubtedly knew that an investigation into an unattended death would be instituted, concealed and/or removed the firearm from the scene in order to impair its availability for inspection.   Therefore, the court concludes that there was at least arguable probable cause to arrest plaintiff for the offense of tampering with physical evidence.

## B.   Motion of Defendants Watson, Sanders, Stephens, Phillips, Bullock, Zeissler, and Hayes

Defendants Steve Watson, Curtis Sanders, Chris Stephens, Kerry Phillips, Marion Bullock, Charles Zeissler, and Robert Hayes assert that plaintiff's claim against them should be dismissed for four reasons:   *first*, plaintiff's amended complaint does not plead conspiracy with sufficient specificity to state a claim for relief;[59] *second*, they are

---

[58] Doc. no. 36 (Brief in Support of Motion to Dismiss), at 21 (alteration supplied).

[59] Doc. no. 41 (Brief in Support of Motion to Dismiss), at 6.

entitled to qualified immunity because they did not participate in plaintiff's arrest or seizure;[60] *third*, even if they did participate in plaintiff's arrest, there was at least arguable probable cause to arrest plaintiff for either the announced offense, or for other offenses;[61] and *fourth*, if plaintiff's claims against the district attorney defendants are dismissed, then these defendants should also be dismissed pursuant to the intracorporate conspiracy doctrine.[62]

Plaintiff asserts the same claim against this group of defendants as he does against the defendants discussed in the preceding Part of this Opinion:  a claim for illegal seizure under 42 U.S.C. § 1983.   This court found that there was arguable probable cause to arrest plaintiff for, not only the announced offense of theft of property in the second degree, but also the offenses of obstructing governmental operations and tampering with physical evidence.   Accordingly, the court concludes that, even if these defendants *did* participate in plaintiff's arrest, they are entitled to qualified immunity, and plaintiff's claim against them is due to be dismissed.

## C.    Motion of Defendants Broussard, Sandlin, and Becher

Plaintiff claims that District Attorney Robert Broussard, and Assistant District Attorneys Robert Becher and Marc Sandlin, approved the "decision to pursue false

---

[60] *Id.* at 17-18.

[61] *Id.* at 20-21.

[62] *Id.* at 25.

criminal charges" against him.[63]   Defendants assert that "absolute prosecutorial immunity

bars [plaintiff's] claim" against them.[64]   They alternatively assert that they are entitled to

qualified immunity.[65]

"Traditional common-law immunities for prosecutors apply to civil cases brought

under § 1983." *Rehberg v. Paulk*, 611 F.3d 828, 837 (11th Cir. 2010) (citing *Imbler v.*

*Pachtman*, 424 U.S. 409, 427-28 (1976)).   As such, "prosecutors have absolute

immunity for all activities that are 'intimately associated with the judicial phase of the

criminal process.'" *Id.* (quoting *Van de Kamp v. Goldstein*, 555 U.S. 335, 341 (2009)).

Even so, the Supreme Court and the Eleventh Circuit have held that absolute

immunity shall not be extended to the prosecutorial function of providing certain "legal

advice" to law enforcement officers.   *See Rehberg v. Paulk*, 611 F.3d 828, 838 (11th

Cir. 2010) (stating that prosecutors do not enjoy absolute immunity for giving pre-

indictment legal advice to the police); *Jones v. Cannon*, 174 F.3d 1271, 1282 (11th Cir.

1999) (stating that "prosecutors have not enjoyed absolute immunity for giving *certain*

*legal advice* to police during an investigation") (emphasis supplied); *Mastroianni v.*

*Bowers*, 173 F.3d 1363, 1366 (11th Cir. 1999) (holding that legal advice to police

officers during a pretrial investigation is not protected by absolute immunity).

---

[63] Doc. no. 30 (First Amended Complaint), ¶ 68.

[64] Doc. no. 43 (Motion to Dismiss), at 2 (alteration supplied).

[65] *Id.*

Plaintiff states that "[b]ecause *no charges had been filed*[,] and because the DA defendants were acting in an *advisory capacity* when they told the sheriff's representatives that they could charge Parton with theft, the DA defendants do not get absolute immunity."[66]   He relies upon the Supreme Court's holding in *Burns v. Reed*, 500 U.S. 478 (1991), to support his argument, saying:

> In *Burns*, the prosecutor advised the police that probable cause existed to arrest the plaintiff.   The Court held the prosecutor was entitled to absolute immunity for participating in a probable-cause hearing but not for giving legal advice to the police.   [500 U.S. at 492-93].   Given this precedent, courts have emphasized, "[t]he Supreme Court has clearly stated that with respect to advising police, prosecutors are entitled to qualified not absolute immunity." *Ewing v. City of Stockton*, 588 F.3d 1218, 1233 (9th Cir. 2009).

Doc. no. 46 (Plaintiff's Response to Defendants' Motions to Dismiss First Amended Complaint), at 8 (first alteration supplied, second alteration in original).   The point that plaintiff fails to either explain or understand is that the prosecutor in *Burns* was deeply involved in the pre-arrest investigation of the plaintiff in that case.   The plaintiff, Cathy Burns, called the police and "reported that an unknown assailant had entered her house, knocked her unconscious, and shot and wounded her two sons while they slept." *Burns*, 500 U.S. at 481.

> The officers came to view [Mrs. Burns] as their primary suspect, even though she passed a polygraph examination and a voice stress test, submitted exculpatory handwriting samples, and repeatedly denied shooting

---

[66] Doc. no. 46 (Plaintiff's Response to Defendants' Motions to Dismiss First Amended Complaint), at 7 (alterations and emphasis supplied).

her sons.

>Speculating that [Mrs. Burns] had multiple personalities, one of which was responsible for the shootings, the officers decided to interview [her] under hypnosis. They became concerned, however, that hypnosis might be an unacceptable investigative technique, and therefore sought the advice of the Chief Deputy Prosecutor respondent Richard Reed. Respondent told the officers that they could proceed with the hypnosis.

>While under hypnosis, [Mrs. Burns] referred to the assailant as "Katie" and also referred to herself by that name. The officers interpreted that reference as supporting their multiple-personality theory. As a result, they detained [Mrs. Burns] at the police station and sought respondent's advice about whether there was probable cause to arrest [her]. After hearing about the statements that [Mrs. Burns] had made while under hypnosis, respondent told the officers that they "probably had probable cause' to arrest [her]. Based on that assurance, the officers placed [Mrs. Burns] under arrest.

*Id.* at 481-82 (alterations supplied). The Supreme Court concluded that "advising the police in the investigative phase of a criminal case" was not an activity that was "so intimately associated with the judicial phase of the criminal process," that it was protected under the absolute immunity doctrine. *Id.* at 493.

Defendants Marc Sandlin and Robert Becher assert that they "never provided *legal advice* to law enforcement," and that "law enforcement contacted the D.A. Office only *to confirm that the D.A. Office would pursue the charge against Parton.*"[67] They assert that they *only* advised law enforcement that, "for the theft of the firearm[,] the

---

[67] Doc. no. 43 (Brief in Support of Motion to Dismiss), at 4-5 (emphasis supplied).

appropriate charge would be theft second."[68]   Defendants state that such *limited* advice, which really is not investigative in nature, is qualitatively different from that provided to law enforcement by the prosecutor in the *Burns* case:

> [In *Burns*], the prosecutor had given "*legal advice to the police regarding the use of hypnosis and the existence of probable cause to arrest petitioner*." *Id.* at 487.   In other words, "legal advice," as that term is used in *Burns*, means advice given to law enforcement about a legal matter, such as *whether probable cause exists or whether law enforcement may use an interrogation tactic*.   But Sandlin and Becher never provided such advice about a legal matter; Parton does not allege that they advised about probable cause, and he does not alleged [*sic*] that they advised about tactics for investigation.   The only advice allegedly given by Sandlin or Becher – *advice about the charge that the D.A. Office would prosecute* — is fundamentally different from legal advice.
>
>        Indeed, the idea that law enforcement sought, or that Sandlin or Becher gave, legal advice is preposterous in light of Parton's allegations. Parton's theory is that law enforcement had already "agreed that Parton should be criminally prosecuted," had already decided that they "needed the DA's office to provide sheriff personnel with cover," and had contacted the D.A.'s office to explain "the importance of prosecuting Parton."   Doc. 30 ¶¶ 79, 82, 86.   Thus Parton alleges that, before contacting the D.A. Office, law enforcement had already decided to arrest Parton.   It is befuddling, to say the least, why law enforcement would have then sought legal advice from the D.A. Office.   Quite simply Parton's allegation is that Sandlin and Becher joined a "widespread conspiracy" to arrest Parton.

Doc. no. 43 (Brief in Support of Motion to Dismiss), at 10-11 (alteration and emphasis supplied).

Neither the Eleventh Circuit, nor any district court within this Circuit, has had occasion to decide the precise legal issue at hand:   that is, *whether a prosecutor's act*

---

[68] *Id.* at 6 (alteration supplied).

*of informing law enforcement officers, prior to an arrest, of the criminal charge he is willing to pursue under a given set of facts, constitutes the provision of the type of "legal advice" that is not intimately associated with the judicial process and, therefore, does not fall within the protections of the absolute immunity doctrine.*

Even so, district courts within the Fifth Circuit have spoken to that precise issue. For example, the Western District of Texas has held that a prosecutor's act of supplying law enforcement officers with a charging decision, and an appropriate monetary amount for bail, was not similar to the "legal advice" given or investigatory functions carried out in *Burns* and, therefore, was protected under the absolute immunity doctrine. *See Bittakis v. City of El Paso*, 480 F. Supp. 2d 895, 916 (W.D. Tex. 2007). Moreover, the Southern District of Texas has held, in an unpublished opinion, that a prosecutor's act of pursuing, or refusing to pursue, criminal charges are acts "of prosecutorial conduct and, as such, are subject to absolute immunity." *Miller v. Harris County*, No. H-08-2826, 2011 WL 4456094, at *14 (S.D. Tex. Sept. 22, 2011). This court finds the reasoning of those opinions to be persuasive, and concludes that defendants Marc Sandlin and Robert Becher are entitled to absolute prosecutorial immunity.

Defendant Robert Broussard, the District Attorney of Madison County, asserts that there are no facts that establish that *he*, personally, "ever met with or otherwise gave legal advice to the police."[69]   Indeed, the only facts alleged by plaintiff regarding the

---

[69] Doc. no. 43 (Brief in Support of Motion to Dismiss), at 7.

alleged involvement of the District Attorney defendants are based upon the notes of Captain Charles Berry, and those notes do not mention Broussard.[70]   Moreover, Broussard argues that, to the extent that he is being sued in his capacity as *supervisor* to Assistant District Attorneys Marc Sandlin and Robert Becher, he is entitled to absolute immunity.   Indeed, the Supreme Court has held that a district attorney sued for his role in supervising or training his office staff enjoys absolute immunity.   *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009).

Accordingly, this court holds that plaintiff's claim against defendant Broussard is due to be dismissed, either on the basis that plaintiff does not "offer in support of [his] claim sufficient factual matter, accepted as true, to raise a right to relief above the speculative level," or that Broussard is entitled to absolute immunity for actions undertaken in his role as supervisor to Assistant District Attorneys Marc Sandlin and Robert Becher.   *See Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1262 (11th Cir. 2015) (alteration supplied).

## IV. CONCLUSION

Based upon the foregoing discussion, each of the motions to dismiss is GRANTED, and it is ORDERED that plaintiff's claim against all defendants is DISMISSED WITH PREJUDICE.   Costs are taxed to plaintiff.   The Clerk is directed to close this file.

---

[70] Doc. no. 1-3 (Notes of Captain Charles Berry), at ECF 1-4.

**DONE** and **ORDERED** this 29th day of June, 2016.

_____
United States District Judge